UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LEO M. GORDON, *JUDGE*

_____
                                          :
AMOENA USA CORP.,                         :
                                          :
                    Plaintiff,            :          Court No. 20-00100
                                          :
          v.                              :
                                          :
UNITED STATES,                            :
                                          :
                    Defendant.            :
_____  :


### DEFENDANT'S REPLY MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*OF COUNSEL*:
FARIHA KABIR
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

BEVERLY A. FARRELL
Senior Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel.: (212) 264-9230 or 0483
Attorneys for Defendant

Dated: June 23, 2025

# TABLE OF CONTENTS

BACKGROUND .......................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................... 2

ARGUMENT ............................................................................................................. 3

I.     STANDARD OF REVIEW……………………………………………………3

II.    THE SUBJECT IMPORTED BRASSIERES ARE *EO NOMINE* BRASSIERES OF
       HEADING 6212 AND DO NOT CONTAIN FEATURES SUBSTANTIALLY IN
       EXCESS OF THOSE THAT FALL WITHIN THE COMMON MEANING OF
       BRASSIERE ...................................................................................................... 5

       A.   The Subject Brassieres Are Described *Eo Nomine* In Heading 6212
            Because They Satisfy The Common Meaning Of Brassiere ....................... 5

       B.   The Features Of The Subject Brassieres Are Not Substantially In Excess
            Of Articles Described By The Common Meaning Of Brassiere ................. 8

       III.  THE SUBJECT BRASSIERES ARE NOT ACCESSORIES OF
            HEADING 9021, HTSUS ............................................................................. 9

CONCLUSION ........................................................................................................ 12

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*ABB, Inc. v. United States*,
   346 F. Supp. 2d 1357 (2004) ................................................................................ 5

*Bausch & Lomb, Inc. v. United States*,
   957 F. Supp. 281 (Ct. Int'l Trade 1997) .............................................................. 4

*Baxter Healthcare Corp. v. United States*,
   182 F.3d 1333 (Fed. Cir. 1999)............................................................................ 4

*CamelBak Prods. v. United States*,
   649 F.3d 1361 (Fed. Cir. 2011).......................................................................... 5

*Carl Zeiss, Inc. v. United States*,
   195 F.3d 1375 (Fed. Cir. 1999)................................................................... 4, 5, 7

*Casio, Inc. v. United States*,
   73 F.3d 1095 (Fed. Cir. 1996)............................................................................. 7

*Degussa Corp. v. United States*,
   508 F.3d 1044 (Fed. Cir. 2007).......................................................................... 4

*Ford Motor Co. v. United States*,
926 F.3d 741 (Fed. Cir. 2019……………………………………………………….7

*GRK Canada, LTD. v. United States*,
   761 F.3d 1354 (Fed. Cir. 2014).......................................................................... 7

*Lerner New York v. United States,*
908 F. Supp. 2d 1313 (Ct. Intl. Trade 2013)……………………………………..6, 8

*Motorola, Inc. v. United States*,
   436 F.3d 1357 (Fed. Cir. 2006)........................................................................ ..4

*North Am. Processing Co. v. United States*,
   236 F.3d 695 (Fed. Cir. 2001)………………………………………………..3-4

*Orlando Food Corp. v. United States*,
   140 F.3d 1437 (Fed. Cir. 1998)......................................................................... 4

*Rollerblade, Inc. v. United States*,
   116 F. Supp. 2d 1247 (Ct. Int'l. Trade 2000) .............................................. 3, 9, 10

*Saab Cars USA, Inc. v. United States,*
  434 F.3d 1359 (Fed. Cir. 2006).......................................................................... 5

*Totes, Inc. v. United States*,
  69 F.3d 495 (Fed. Cir. 1995)............................................................................. 11

*Victoria's Secret Direct, LLC v. United States,*
  908 F. Supp. 2d 1332 (Ct. Intl. Trade 2018)................................................. 6, 8

*Wilton Indus., Inc. v. United States*,
  741 F.3d 1263 (Fed. Cir. 2013)…………………………………………………..4

**Harmonized Tariff Schedule of the United States (HTSUS)**

General Rule of Interpretation 1 ........................................................................ 9

General Rule of Interpretation 3(a)............................................................... 10, 11

Heading 6212 ..............................................................................................*passim*

      Subheading 6212.10.90.......................................................................... 2, 3

Heading 9021 ....................................................................................... 3, 9, 10, 11

      Subheading 9021.39.00................................................................................ 2

**Statutes**

28 U.S.C. § 2639(a)(1)........................................................................................ 4

**Other Authorities**

Explanatory Note 62.12 ...................................................................................... 7

*American Heritage Dictionary* 10 (3d ed. 1996)…………………………………...10

*Fairchild Dictionary of Fashion* 463 (3d ed. 2003)...……………………………….6

*2 Oxford English Dictionary* 494 (2d ed. 1989)………………………………….....6

*Random House Webster's Unabridged Dictionary* 11 (2d ed. 1998)……………………..9

*Scribner-Bantam English Dictionary* 7 (1991)…………………………………….10

*Webster's Collegiate Dictionary* 7 (2d ed. 1977)…………………………………..9

*Webster's Dictionary* 269…………………………………………………………...6

*Webster's New World Dictionary of the American Language* 4 (2d concise ed. 1978)............9

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. LEO M. GORDON, *JUDGE*

———————————————————————     :
                                                                :
AMOENA USA CORP.,                                 :
                                                                :
                              Plaintiff,               :                   Court No. 20-00100
                                                                :
               v.                                         :
                                                                :
UNITED STATES,                                       :
                                                                :
                              Defendant.            :
———————————————————————     :

## DEFENDANT'S REPLY MEMORANDUM OF LAW

In accordance with the Court's June 6, 2023 Order, ECF No. 67, defendant, the United States (the Government), submits this reply memorandum in opposition to plaintiff's motion for summary judgment, and in further support of our cross-motion for summary judgment.  For the reasons set forth below, we respectfully request that the Court enter an order denying plaintiff's motion for summary judgment; granting our cross-motion for summary judgment; and dismissing this action in its entirety.

As shown in our cross-motion for summary judgment and further demonstrated below, the subject merchandise is properly classified *eo nomine* under Heading 6212, Harmonized Tariff Schedule of the United States (HTSUS), as a brassiere.

## BACKGROUND

This case concerns the proper classification of mastectomy brassieres, which were the imported under the cover of a single entry on April 25, 2016.  In connection with our cross-motion for summary judgment we provided samples of the Amoena brassieres at issue: Mona 0591 (Def. Ex. 11), Lara SB 0675 (Def. Ex. 5), Lara SB 0647 (Def. Ex. 4), Lara Satin SB 44214

(Def. Ex. 6), Ester SB 42576 (Def. Ex. 12), Barbara WB 0457 (Def. Ex. 7), Magdalena SB 0463 (Def. Ex. 8), Isadora SB 0947 (Def. Ex. 10), and Nancy SB 1151 (Def. Ex. 9).  JSMF ¶ 3.[1]

U.S. Customs and Border Protection (Customs or CBP) classified the subject merchandise upon liquidation of the entry at issue under subheading 6212.10.90, HTSUS, with a 16.9 percent *ad valorem* duty rate.  JSMF ¶¶ 4, 5.  Subheading 6212.10.90, HTSUS covers "[b]rassieres, girdles, corsets, braces, suspenders, garters and similar articles and parts thereof, whether or not knitted or crocheted: [b]rassieres: [o]ther."  Plaintiff Amoena US Corp. (Amoena) contends that these imported brassieres should be classified under subheading 9021.39.00, HTSUS, duty-free, as parts and accessories of other artificial parts of the body.

## SUMMARY OF ARGUMENT

Samples of the subject merchandise are available for the Court.[2]  A brassiere has been defined by this Court as a "woman's close-fitting undergarment having cups for bust support, varying in width from a band to a waist length bodice, made with or without straps, and often boned or wired for additional support or separation; also: an adaptation of this garment for sportswear"; "woman's undergarment worn to support the breasts" and "shaped undergarment worn by women to mold and support the breasts."  The subject merchandise satisfies these definitions.

The fact that plaintiff has added some design features and intends for its brassieres to hold a breast form for women who have had a mastectomy or lumpectomy does not result in a change of the identity of the imported merchandise as brassieres.  An *eo nomine* term covers all

---

[1] As noted in our cross-motion, we have used the same exhibit designation used during the CIT Rule 30(b)(6) deposition of Amoena.

[2] The breast forms referenced by plaintiff in its motion for summary judgment were not imported as part of the entry at issue in this action.

forms of the named article, and an *eo nomine* term should not be limited by use unless the term itself inherently suggests a type of use.  Here, no such use limitation is suggested by the term "brassieres."  Indeed, the Explanatory Notes to heading 6212 make this clear and reinforce this principle by stating that the heading includes "brassieres of all kinds."  These notes further provide that these "brassieres of all kinds" "may incorporate fittings and accessories of non-textile materials."  Thus, a mastectomy brassiere, which may incorporate a breast form, such as the merchandise here, is fully described by heading 6212.

The subject merchandise is not classifiable under heading 9021 because it does not satisfy the common meaning of the term "accessory" as construed by this Court in *Rollerblade, Inc. v. United States*, 116 F. Supp. 2d 1247, 1252 (Ct. Int'l Trade 2000) *aff'd* 282 F.3d 1349 (Fed. Cir. 2002).  The breast form is adjunct to the brassiere.  The form cannot function without the brassiere.  Thus, while a woman can wear a brassiere without the breast form, she cannot wear the breast form without the brassiere, which is necessary to hold it in place.

Because there are samples and no disputes as to material facts regarding the imported merchandise, determining the proper classification of the mastectomy brassieres collapses into a question of law.  Based on the common meaning of the terms brassiere and accessory, the imported merchandise should be classified as brassieres of heading 6212, and more specifically under subheading 6212.10.90.

## **ARGUMENT**

## I.    THE STANDARD OF REVIEW

The Court reviews Customs' classification decisions *de novo*.  Determining the proper tariff classification entails a two-step process: (1) ascertaining the proper meaning of specific terms in the tariff provision, which is a question of law; and (2) determining whether the

merchandise at issue comes within the description of such terms as properly construed, which is a question of fact. *North Am. Processing Co. v. United States*, 236 F.3d 695, 697 (Fed. Cir. 2001); *see also Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1265–66 (Fed. Cir. 2013).

To make its *de novo* determination, the Court looks to the General Rules of Interpretation (GRIs) of the HTSUS. First, "[a] classification analysis begins, as it must, with the language of the headings." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Where there is a dispute as to the nature of the merchandise, the Court first interprets the language of the tariff headings at issue. *Id.* at 1439. "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). In construing the common meaning of a statutory term, the Court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used" when the tariff term lacks a clear definition. *Baxter Healthcare Corp. v. United States*, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999).[3]

Customs' classification decisions are statutorily entitled to a presumption of correctness. *See* 28 U.S.C. § 2639(a)(1) (classification decision "is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision.") Where, as here, a plaintiff challenges Customs' classification decision, "a court presumes that Customs applied the

---

[3] The Court may also consult the World Customs Organization's Explanatory Notes for the Harmonized Commodity Description and Coding System, which although not legally binding "are generally indicative of the proper interpretation of a tariff provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)). In determining whether an item is properly classified under a particular heading in the HTSUS, the Explanatory Notes may be persuasive authority when they specifically include or exclude an item from a tariff heading. *See, e.g., Bausch & Lomb, Inc. v. United States*, 957 F. Supp. 281, 288 (Ct. Int'l Trade 1997), *aff'd*, 148 F.3d 1363 (Fed. Cir. 1998).

provision correctly, which means that the plaintiff is left with the burden of showing by a preponderance of the evidence that Customs' decision was incorrect." *ABB, Inc. v. United States*, 28 CIT 1444, 346 F. Supp. 2d 1357, 1364 (2004); *see also Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (a plaintiff must "meet its burden of contradicting Customs' presumed correct factual finding . . . .").

## II. THE SUBJECT IMPORTED BRASSIERES ARE *EO NOMINE* BRASSIERES OF HEADING 6212 AND DO NOT CONTAIN FEATURES SUBSTANTIALLY IN EXCESS OF THOSE THAT FALL WITHIN THE COMMON MEANING OF BRASSIERE

Although Amoena's Response/Reply focuses on the development of its breast forms, their costs and their medical necessity, the imported articles at issue in this action are not breast forms, they are brassieres, samples of which have been provided to the Court.  In its Response/Reply to the Government's cross-motion for summary judgment, although Amoena describes the imported merchandise as mastectomy brassieres, Amoena argues that the subject brassieres do not satisfy the common meaning of the *eo nomine* term brassiere.  Amoena further argues that even if the merchandise did satisfy the common meaning, the design, use, and function are "substantially in excess" of ordinary brassieres and therefore they are not classifiable under heading 6212.  Pl. Response/Reply at 5.  For the reasons that follow, plaintiff is incorrect.

### A. The Subject Brassieres Are Described *Eo Nomine* In Heading 6212 Because They Satisfy The Common Meaning Of Brassiere

Heading 6212, under which CBP classified the subject merchandise, is an *eo nomine* provision which describes an article, in this case a brassiere, by a specific name.  *See CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011) (citing *Carl Zeiss*, 195 F.3d at 1379).  An *eo nomine* provision '"include[s] all forms of the named article[,]' even improved forms." *Id.* at 1365.

Amoena once again misconstrues the determination of this Court in *Lerner New York v. United States*, 908 F. Supp. 2d 1313, 1326 (Ct. Int'l Trade 2013); and *Victoria's Secret Direct LLC v. United States*, 908 F. Supp. 2d 1332, 1353-54 (Ct. Int'l Trade 2013) when it claims that "no 'standard definition' of the term brassiere exists."  Pl. Response/Reply at 6.  And contrary to Amoena's contention, *id.*, we did not overlook or fail to address the full scope of the definitions for brassiere cited by the Court when we asserted that the subject merchandise is by definition an *eo nomine* brassiere.  Def. Mov. Br. at 10.  What the *Lerner/Victoria's Secret* court stated was that it "has not found a standard dictionary definition of the term 'brassiere' to which the Bra Top [or Bodyshaper] conforms."  However, in determining that a brassiere is "a women's undergarment designed to provide bust support (as required by the common definitions)," *see Victoria's Secret*, 908 F. Supp 2d at 1354, it relied upon the following definitions:

- a woman's close-fitting undergarment having cups for bust support, varying in width from a band to a waist length bodice, made with or without straps, and often boned or wired for additional support or separation; also: *an adaptation of this garment for sportswear (Webster's Dictionary 269)*;

- woman's undergarment worn to support the breasts (2 *Oxford English Dictionary* 494 (2d ed. 1989); and

- a shaped undergarment worn by women to mold and support the breasts (*Fairchild Dictionary of Fashion* 463 (3d ed. 2003)).

As we explained in our moving brief, the subject articles conform to these definitions the term "brassiere" because they are close fitting undergarments that have cups and straps and provide bust support.  This is consistent with the Court's short-hand definition that a brassiere is "a women's undergarment designed to provide bust support."  Indeed, in its Rule 30(b)(6) deposition, Amoena noted that one of the main features is that "the bra has a pocket on both sides which are equal, because you never know which side has been removed.  So we create bras

6

which can be used for either side or both sides." Attachment B, p. 35:10-15 (Rule 30(b)(6) Deposition of Plaintiff). Further, because the breast form is intended to replace the natural breast, Decl. Andrea Coomans, ECF 65-1 at ¶¶ 4, 5, the subject brassieres are providing support to a women's bust, even though a portion of that bust may not be natural breast tissue or muscle. Therefore, the subject merchandise satisfies the common meaning of the term brassiere.

Moreover, "a use limitation should not be read into an *eo nomine* provision unless the name itself inherently suggests a type of use." *Carl Zeiss*, 195 F.3d at 1379. Unlike the "other wood screws" of *GRK Canada, LTD. v. United States*, 761 F.3d 1354, 1359 (Fed. Cir. 2014) or the "[m]otor cars and other motor vehicles principally designed for the transport of persons" of *Ford Motor Co. v. United States*, 926 F.3d 741, 750 (Fed. Cir. 2019), a "brassiere" does not implicate use, and the articles that fall within heading 6212 should not be narrowed based on the use of the article. In fact, the Explanatory Note to heading 6212, EN 62.12, provides that the "heading covers articles of a kind designed for wear as body-supporting garments" and includes "brassieres of all kinds. Further, EN 62.12 explains that the articles of this heading, such as brassieres, "may be furnished with trimmings of various kinds (ribbons, lace, etc.) and may incorporate fittings and accessories of non-textile materials (e.g., metal, rubber, plastics or leather). Thus, the EN 62.12 provides further support that improvements to the brassiere that would facilitate incorporating a breast form in the brassiere.

The only potential issue is whether the presence of pockets in the cups of the brassieres, a wider under band, and the increased coverage provided by the cups and the support provided by the sides are "features s*ubstantially in excess* of those within the common meaning of the term [brassiere]". *Casio, Inc. v. United States*, 73 F.3d 1095, 1098 (Fed. Cir. 1996). As discussed below, they are not.

7

**B.  The Features Of The Subject Brassieres Are Not Substantially
In Excess Of Articles Described By The Common Meaning Of Brassiere**

Amoena argues that the Government ignores the design, use, and function of the

imported brassieres.  Pl. Response/Reply at 8-10.  We do not ignore the design features or that

the subject bras are intended to be used with Amoena's breast forms.  However, the design, use,

and function of the brassieres reveal that the articles possess design features of brassieres and are

used as brassieres because they support the bust of the wearer.  And, consistent with EN 62.12,

the presence of a breast form fitted into the pocket in the cup, does not narrow the term brassiere,

which covers brassieres of all kinds.  Therefore, the design features are not substantially in

excess of the common meaning of brassiere.  Indeed, some brassieres possess pockets for

padding.  *See* Attachment A (Vermilion Bird Women's Bras); *see also*

www.rhondashear.com/collections/pocket-bras.  And support features such as wider straps and

wider under bands are not limited to the subject brassieres.  *See* www.playtexbras.com (such as

the 18 Hour® Collection where features and benefits include extra side support and full

coverage) and *compare with* Attachment B, p. 49:20-51:4 (Amoena testifying that as the cups

size gets larger the replacement breast gets heavier and requires wider straps); *see also*

Attachment B, p. 58:2-59:6 (Amoena testifying that the Barbara style has side bones for support,

which is consistent with the *Webster Dictionary* definition cited by the *Victoria's Secret/Lerner*

Court.); p. 76:14-77:11 (Amoena testifying that first the subject brassiere must be fitted to the

woman to account for the remaining breast and then to determine the best breast form.).

Amoena admits that it first developed breast forms and did not begin developing and

selling mastectomy bras until years later.  Decl. Andrea Coomans, ECF 65-1 at ¶ 5.  Thus, the

users of the breast forms would have had to place them in brassieres that were available in the

marketplace.  Amoena, in developing its brassieres, simply improved on those bras already being

8

used by women to hold the Amoena breast form.  As a result, the subject brassieres have not undergone a change in their identity as a brassiere.  Therefore, they are properly classifiable under heading 6212.

## III.    THE SUBJECT BRASSIERES ARE NOT ACCESSORIES OF HEADING 9021, HTSUS

Amoena argues that the subject brassieres should be classified as accessories of heading 9021 because they are principally used to hold the breast form.  Pl. Response/Reply at 10-13. This position is incorrect because the subject brassieres support the bust, which may include the replacement breast, and thus are simply brassieres.  Therefore, the imported articles are completely described under GRI 1 as brassieres of heading 6212.  Moreover, these brassieres are not accessories of a breast form because they do not meet the common meaning of "accessory."

Because the tariff does not define the term "accessory," resort to lexicographic authorities is necessary to ascertain its common meaning.  *Rollerblade , Inc. v. United States*, 116 F. Supp. 2d 1247, 1252 (Ct. Int'l Trade 2000) *aff'd* 282 F.3d 1349 (Fed. Cir. 2002).  In *Rollerblade*, this Court provided several definitions for "accessory" such as:

- something extra added to help in a secondary way; specif., a) an article to complete one's costume, as a purse, gloves, etc. b) a piece of optional equipment for convenience, comfort, etc. (*Webster's New World Dictionary of the American Language* 4 (2d concise ed. 1978);

- 1.a A thing of secondary or subordinate importance; adjunct; 1.b An object or device not essential in itself but adding to the beauty, convenience or effectiveness of something else. (*Webster's Collegiate Dictionary* 7 (2d ed. 1977));

- A subordinate or supplementary part, object or the like, used mainly for convenience, attractiveness, safety, etc. (*Random House Webster's Unabridged Dictionary* 11 (2d ed. 1998));

- Additional or subordinate thing, adjunct; article not absolutely essential that adds to the attractiveness, convenience, effectiveness, or safety of something else. (*Scribner–Bantam English Dictionary* 7 (1991)); and

- 1.a A subordinate or supplementary item; an adjunct. 1.b Something non-essential but desirable that contributes to an effect or result. (*American Heritage Dictionary* 10 (3d ed. 1996)).

116 F. Supp. 2d at 1252.

Here, the breast form is subordinate to the brassiere. The form cannot function without the brassiere. Thus, while a woman can wear a brassiere without the breast form, she cannot wear the breast form without the brassiere to hold it in place. In this context, it is the breast form, not the brassiere, that is optional. A brassiere, on the other hand, is essential if a woman opts to use a breast form, otherwise there is no other way for the breast form to serve as a replacement breast. As Amoena acknowledges, "[t]he mastectomy bras feature a double pocket that secures the breast form in place to prevent the form from falling out." Decl. Andrea Coomans, ECF 65-1 at ¶ 4. As such, they are not adjunct, non-essential or merely adding beauty, convenience or effectiveness. Instead, the subject brassieres are the critical article providing support for the replacement breast form. Because the subject brassieres do not meet the common meaning of the terms "accessory," they are not classifiable under heading 9021.

Finally, if the Court were to determine that the merchandise is *prima facie* classifiable under both heading 6212 and heading 9021 then resort to GRI 3(a) would be necessary. GRI 3(a) calls for classification under the "heading which provides the most specific description," the subject merchandise would be classifiable under heading 6212, not heading 9021, because the term "brassiere" is more specific than the term "accessory." A brassiere has a specific definition and identity whereas an accessory may include a wide variety of items having many different functions.

10

Indeed, in *Totes, Inc. v. United States*, 69 F.3d 495 (Fed. Cir. 1995), the Federal Circuit had an opportunity to construe the concept of greater specificity under GRI 3(a) when classifying the Totes Trunk Organizer, which was *prima facie* classifiable in two competing headings: heading 4202 as a similar container and heading 8708 as a motor vehicle accessory. The appellate court concluded that the competing provisions were not equal. 69 F.3d at 499. It found that the tariff provision for "similar containers" more specifically described the trunk organizer, finding that containers "essentially have the one principal function of containing, even though encompassing a wide variety thereof." *Id.* In comparison, the Federal Circuit found that the term accessory could "include a wide variety of items having many functions." As a result, using the greater specificity doctrine, the Federal Circuit rejected classification of the Totes Trunk Organizer as a motor vehicle accessory. *Id.*

Consistent with GRI 3(a), heading 6212 provides the most specific description of the merchandise as a brassiere, *i.e.*, an article that provides support to a woman's bust, in comparison to accessories of heading 9021, a broad term that ranges from "[o]rthopedic appliances, including crutches, surgical belts and trusses; splints and other fracture appliances; artificial parts of the body; [to] hearing aids and other appliances which are worn or carried, or implanted in the body, to compensate for a defect or disability." Heading 9021, HTSUS. Therefore, the subject merchandise should be classified as brassieres of heading 6212.

# <u>CONCLUSION</u>

For the foregoing reasons and those in our moving brief, defendant respectfully requests that an order be entered denying plaintiff's motion for summary judgment; granting defendant's cross-motion for summary judgment and dismissing this action in its entirety; and granting defendant such other and further relief as may be just and appropriate.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

/s/Justin R. Miller

By:    JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*
FARIHA KABIR
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

/s/ Beverly A. Farrell
BEVERLY A. FARRELL
Senior Trial Attorney
Civil Division, Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, NY 10278
Tel. (212) 264-9230 or 0483
Attorneys for Defendant

Dated: June 23, 2025

12

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. LEO M. GORDON, *JUDGE*

_____
                                        :
AMOENA USA CORP.,                       :
                                        :
                    Plaintiff,          :         Court No. 20-00100
                                        :
            v.                          :
                                        :
UNITED STATES,                          :
                                        :
                    Defendant.          :
_____:

## <u>CERTIFICATE OF COMPLIANCE</u>

I, BEVERLY A. FARRELL, a Senior Trial Attorney in the Office of the Assistant

Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field

Office, who is the attorney responsible for Defendant's Reply Memorandum of Law in

Opposition to Plaintiff's Motion for Summary Judgment and in Further Support of Defendant's

Cross-Motion for Summary Judgment, relying upon the word count feature of the word

processing program used to prepare the response, certify that this memorandum complies with

the word count limitation under the Court's chambers procedures and contains 3,403 words.

                                        <u>/s/ Beverly A. Farrell</u>
                                        Beverly A. Farrell

# ATTACHMENT A

amazon.com: Vermilion Bird

**Vermilion Bird**



Follow    [share icon]    🔍 Search all Vermilion Bird



## Vermilion Bird Women's 3 Pack Seamless Comfortable Sports Bra with Removable Pads

Filter by    In stock



○ ○ ○ ○

✓prime

**Get it by Saturday, June 28.**

Sold by LUOCAN Trading and Fulfilled by Amazon.

- Multicoloured-8 pack;Perfect for yoga, dance and other low-impact moves
- Removable bra period pads-The inside of the cup has a small opening that contains a removable pad. Removable pads are easy to put in & take out.
- The material of the sport bra is super comfortable and breathable;Super soft and stretchy.The stretchy straps do not dig into shoulders.
- Double layer knitted construction -Seamless compression bra designed for low impact activities. The straps are wide and supportive as well
- Built for Low-Impact activity & all-day comfort;Next-to-skin without the squeeze;It's a stretchy bra you can easily stretch it.

Show less

See all details    Add to Cart

# ATTACHMENT B

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE LEO M. GORDON, JUDGE

------------------------------------------------x

AMOENA USA CORP.,

                        Plaintiff,

-v-                            Court No. 20-00100

UNITED STATES,

                        Defendant.

------------------------------------------------x

                    RULE 30(B)(6)

              EXAMINATION BEFORE TRIAL

                        OF

                  AMOENA USA CORP.,

                  PLAINTIFF HEREIN

            by and through its agent,

                CHRISTINA SCHROETER

HELD:          FRIDAY, DECEMBER 08, 2023

START TIME:    10:05 a.m.

END TIME:      12:11 p.m.

LOCATION:      NEW YORK, NY

REPORTER:      MICHELLE TROY PARRISH

JOB NO.:       136525

Page 2

1 This is the 30(b)(6) Deposition of Plaintiff
2 herein, AMOENA USA CORP., by and through its
3 agent, CHRISTINA SCHROETER, taken pursuant to
4 Rule 30(b)(6) Notice of Deposition , held at:
5
6   United States Department of Justice
7    26 Federal Plaza
8     New York, NY
9
10 said witness being duly sworn and record
11 reported via steno writer by MICHELLE TROY
12 PARRISH, Certified Court Reporter and Notary
13 Public within and for the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    APPEARANCES:
2 GRUNFELD DESIDERIO LEBOWITZ
3 SILVERMAN & KLESTADT LLP
4 Attorneys for Plaintiff AMOENA USA CORP.
5 599 Lexington Avenue - 36th Floor
6 New York, New York 10022-7648
7 212-973-7717
8 BY: WILLIAM MARSHALL, ESQ.
9 wmarshall@gdlsk.com
10 -AND-
11 BY: ROBERT SILVERMAN, ESQ.
12 rsilverman@gdlsk.com
13
14
15 UNITED STATES DEPARTMENT OF JUSTICE
16 Attorneys for Defendant UNITED STATES
17 26 Federal Plaza, Suite 346
18 New York, New York 10278
19 212-264-0483
20 BY: BEVERLY FARRELL, ESQ.
21 beverly.a.farrell@usdoj.gov
22 ALSO PRESENT:
23 FARIHA KABIR, ESQ., USCBP
24
25

Page 4

1     I N D E X
2    TO TESTIMONY
3   WITNESS: CHRISTINA SCHROETER
4 EXAMINATION BY     PAGE
5 MS. FARRELL     16
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   TO EXHIBITS MARKED
2 DEFENDANT'S  DESCRIPTION   PAGE
3 Exhibit 1 Rule 30(b)(6) Notice of  10
4      Deposition, re: Court No.
     20-00100, consisting of 4
5      pages; attached hereto
6 Exhibit 2 Summons re: Case   17
     1:20-cvc-00100,
7      consisting of 6 pages;
     attached hereto
8 Exhibit 3 Packet of documents,  27
     under cover page
9      indicating Exhibit A,
     consisting of 19 pages;
10      attached hereto
11 Exhibit 4 Sample of an Amoena  38
     "Lara" bra; retained by
12      counsel
13 Exhibit 5 Sample of an Amoena  48
     "Lara" bra with larger
14      cup size; retained by
     counsel
15
16 Exhibit 6 Sample of an Amoena  53
     "Lara" satin bra;
17      retained by counsel
18 Exhibit 7 Sample of an Amoena  57
     "Barbara" bra; retained
19      by counsel
20 Exhibit 8 Sample of an Amoena  64
     "Magdalena" bra; retained
21      by counsel
22 Exhibit 9 Sample of an Amoena  69
     "Nancy" bra; retained by
23      counsel
24 Exhibit 10 Sample of an Amoena  78
     "Isadora" bra; retained
25      by counsel

Page 6

```
1        TO EXHIBITS MARKED (Continued)
2    DEFENDANT'S   DESCRIPTION          PAGE
3    Exhibit 11  Sample of an Amoena     83
4              "Mona" bra; retained by
               counsel
5    Exhibit 12  Sample of an Amoena     88
6              "Ester" bra; retained by
               counsel
7    Exhibit 13  Packet of documents,    92
8              under cover page
               indicating Exhibit D,
9              consisting of 4 pages;
               attached hereto
10   Exhibit 14  Packet of documents,    99
11             under cover page
               indicating Exhibit E,
12             consisting of 9 pages;
               attached hereto
13   Exhibit 15  Packet of documents,    99
14             under cover page
               indicating Exhibit F,
15             consisting of 16 pages;
               attached hereto
16   Exhibit 16  Document entitled Fit   106
17             Specialist Educational
               Course - Introduction,
18             Provided by Amoena,
               consisting of 99 pages;
19             attached hereto
20   Exhibit 17  BOC document, signed by 106
               Claudia Zacharias,
21             MBA,CAE, President & CEO,
               BOC, consisting of 1
22             page; attached hereto
23   Exhibit 18  Plaintiff's Response to 115
               Defendant's First Set of
24             Interrogatories, re:
               Court No. 20-00100,
25             consisting of 8 pages;
               attached hereto
```

Page 7

```
1    F E D E R A L   S T I P U L A T I O N S
2         IT IS HEREBY STIPULATED AND
3    AGREED, by and between the attorneys for the
4    respective parties hereto, that filing,
5    sealing, and certifications of the within
6    deposition are hereby waived;
7
8         IT IS FURTHER STIPULATED AND
9    AGREED that the original of the within
10   deposition may be sworn to and signed before
11   any officer authorized to administer an oath,
12   with the same force and effect as if signed
13   and sworn to before the Court;
14
15        IT IS FURTHER STIPULATED AND
16   AGREED that an unsigned copy of the deposition
17   may be used with the same force and effect as
18   if signed by the witness, 30 days after
19   service of the original & one copy of same
20   upon counsel for the witness.
21
22
23
24
25
```

Page 8

```
1         IT IS FURTHER STIPULATED AND
2    AGREED that all objections except as to form,
3    are reserved to the time of trial.
4
5         IT IS FURTHER STIPULATED AND
6    AGREED that exhibits may be marked by the
7    attorney presenting the exhibit to the
8    witness; and
9    THAT a copy of any exhibit presented to a
10   witness shall be emailed to or otherwise in
11   possession of all counsel prior to any
12   questioning of a witness regarding the exhibit
13   in question; and
14
15        THAT all parties shall bear
16   their own costs in the conduct of this
17   deposition.
18
19        * * * * * * * * * * * *
20
21
22
23
24
25
```

Page 9

```
1         THIS IS THE ORAL DEPOSITION OF
2    CHRISTINA SCHROETER, appearing on behalf of
3    the PLAINTIFF herein, AMOENA USA CORP.,
4    produced pursuant to RULE 30(B)(6) NOTICE OF
5    DEPOSITION , on FRIDAY, DECEMBER 08, 2023,
6    before MICHELLE TROY PARRISH, a Court Reporter
7    and Notary Public in and for the State of New
8    York.
9         * * * * * * *
10        COURT REPORTER:  Would the
11        witness please raise your
12        right hand.
13        THE WITNESS:  (Complied.)
14        COURT REPORTER:  Do you
15        swear or affirm the
16        testimony you give will be
17        the truth under penalty of
18        perjury?
19        THE WITNESS:  I do.
20        COURT REPORTER:  Please
21        state your full name for
22        the record.
23        THE WITNESS:  Christina
24        Schroeter.
25        COURT REPORTER:  Please
```

Page 30

1   And then we have on the left
2   side it's like a bill of material,
3   we call it "BOM," so we have all
4   materials which -- how do you say
5   -- the product consists of are
6   listed here.
7       So we have the main fabric
8   with the internal article number of
9   the fabric or the fabric
10  manufacturer, then we have the
11  embroidery fabric, pocket fabric,
12  back wing lining. We have a little
13  bow here.
14      So this is everything, and
15  the pricing there as well, the
16  width of the material, the weight
17  and the material composition.
18      So with that info, and down
19  there we have samples exactly what
20  we order from them, so we need
21  photo samples for fitting and we
22  need advertisement samples and
23  sizing samples.
24      So this is all the info for
25  the manufacturer, what he has to

Page 31

1   supply us with and the remarks of
2   what they need to use for
3   packaging. So we have packaging
4   size samples. It's different to
5   packaging for bulk sometimes. We
6   have a packaging for bulk.
7       In Australia is different.
8   They use stickers. They have other
9   system there.
10      And with hang text this
11  particular style has to have.
12      And then there is the FOB,
13  the profiles we're bringing in.
14  The auto minimum, so they have a
15  certain quantity of pieces we have
16  to order because of the fabric
17  consumption or the fabric minimum
18  we need to meet and how much the
19  sizing sample costs as well.
20      That sheet we create for
21  each style, so that's a lot of info
22  in there. But yes, we need that as
23  a quality.
24  Q.   So I see that in particular
25  on the first sheet it's --

Page 32

1   A.   Adriana.
2   Q.   -- Adriana.
3       It says SB.
4       What does that "SB" stand
5   for?
6   A.   Soft bra.
7       So we have different sort of
8   bras. We have soft bra, which does
9   only have -- it's really soft. It
10  doesn't have a --
11  Q.   Underwire?
12  A.   Underwire, exactly.
13      And then we have the soft
14  bra, padded, which has a light
15  padding inside; and then we have
16  the wired bra with a wire.
17  Q.   So we would see that in the
18  article name?
19  A.   Exactly.
20  Q.   "SB" would be the soft bra?
21  A.   "SBP" would be the soft bra
22  padded and "WB" is the wired bra.
23  Q.   Makes sense.
24      So, how would the
25  manufacturer --

Page 33

1       Here there is a company in
2   Vietnam that is going to
3   manufacture this for Amoena. How
4   would they know exactly what the
5   specifications should be, the size,
6   each piece of the brassiere, the
7   back, the underbra, the straps; how
8   would they know what sizes and what
9   to do with that?
10      Is there a kind of
11  instruction from Amoena of what is
12  expected of that manufacturer?
13  A.   Yes. We have a quality
14  manual as well, what they want to,
15  yes, follow what qualities'
16  specifications.
17      Let's say like the size or
18  the width of the straps, the hook
19  and eyes, how wide they are or how
20  thick they should be.
21      Then we have a measurement
22  chart as well, which is not
23  attached here. We have a
24  measurement chart for all sizes and
25  the tolerances as well, so they

Page 34

1    know exactly for which size, which
2    measurements they need.
3         The thing is that we worked
4    together with those manufacturers
5    for years already, so it's really
6    they have the expertise, they know
7    what to do, they know how to create
8    a pattern.
9         And if we do a completely
10   new style, we basically base it on
11   an already existing pattern and
12   then modify it slightly because the
13   key features always have to be sort
14   of the same.  And we don't change
15   manufacturers because they know.
16        So we're working for years
17   already with them, so they do know
18   what we need and what we look for.
19        And, I mean, we're a small
20   company.  We don't have, like, huge
21   numbers, but they do those products
22   for us with a lot of great
23   expertise, yes.
24   Q.    With respect to designing
25   one of these bras, what features

Page 35

1    are necessary to give it the
2    purpose that it has, which is to
3    hold the form?  Can you describe
4    that?
5    A.    So, for us it is a breast
6    form holder.  So the purpose is
7    basically to hold the breast form
8    in place.
9         So the main features are
10   that the bra has a pocket on both
11   sides which are equal, because you
12   never know which side has been
13   removed.  So we create bras which
14   can be used for either side or both
15   sides.
16        Then it has -- usually the
17   coverage of the cup is high so we
18   can cover, like, the breast form.
19   So what we don't want is that woman
20   wearing a brassiere and you see
21   small piece of breast form
22   underneath, so the cups are really
23   covered.
24        Then we have always an
25   under-bust band which gives

Page 36

1    support.  The side panels are
2    usually high, so you have that
3    support from the side as well.  We
4    have elastic and non-elastic parts
5    in that bond, and what is important
6    as well is the construction of the
7    positioning of the straps.  So they
8    are a bit more towards the neckline
9    or towards the cups so it holds the
10   breast form better, so it doesn't
11   -- how do you say that -- it has a
12   good support.
13        And usually, in fashion
14   bras, for example, the straps can
15   be a bit more towards the
16   shoulders, because it's more
17   elegant.  But we take care of
18   really -- how do you say -- that
19   best --
20        Our R&D developers, they
21   always measure the widths of the
22   straps so we have a certain
23   measurement they have to keep so it
24   just doesn't slide off the
25   shoulders, for example, and then

Page 37

1    everything can fall off.
2    Q.    So, something like a sports
3    bra because those straps are a
4    little bit closer?
5    A.    No, with a sports bra, this
6    is what some doctors say as well,
7    but this is not because a sports
8    bra is really designed for sports.
9         And ours are designed to
10   hold the breast form, so we really
11   make sure that everything is kept
12   in this area in the upper torso,
13   and this breast form, this external
14   breast form, has to be kept at the
15   position it's supposed to be in the
16   end and the whole construction is
17   important for that.
18        But these are the key
19   features every bra has to follow,
20   yes.
21   Q.    So, we have some samples.
22   A.    I have some as well.
23   Q.    You have brought some?
24   A.    These are the same samples
25   that I have.

Page 46

1    bit more --
2        It has very less spandex
3    inside, so it's not really elastic.
4    Q.    Doesn't have much give?
5    A.    No.
6        So that's the one.  So it's
7    just --
8        It imitates a wire, but it
9    isn't a wire.  So but this here,
10   what I see here, that's what we
11   call the frame here, like this
12   here, which is around the cups, and
13   this is important as well.  This
14   gives the support and the fixation
15   of the breast form.
16       So in the middle this is
17   always there and we have -- you
18   see, this is a charmeuse inside,
19   usually it's doubled here, you have
20   the outer fabric and the charmeuse
21   inside, which is not elastic, so
22   you have the stability here in that
23   area because we don't want the
24   breasts to move together so they
25   should stay in place, and that's

Page 47

1    why we have that in here.
2        And the cups are basically
3    -- they have a good coverage as
4    well.
5        So sometimes the woman have
6    scars and from radiation burns as
7    well and they want this covered.
8    Q.    On this page for the Lara,
9    so it's Exhibit 3, pages associated
10   with Exhibit 4.
11       It says in the materials,
12   "H&E."
13       Do you know what that stands
14   for?
15   A.    Hook and eye.  That's this
16   one here at the back (Indicating).
17   Q.    Are all of the Amoena
18   brassieres hook and eye or any
19   other fashions?
20   A.    They are mostly hook and
21   eye.
22       We have sometimes brassieres
23   with a center front closure as
24   well, and they can be a zipper as
25   well, but that's most common to

Page 48

1    have hook and eye, yes.
2        MS. FARRELL:  If we can
3    mark this as Exhibit 5.
4        * * * * * * *
5        (Sample of an Amoena "Lara" bra
6    with larger cup size was marked as
7    Defendant's  Exhibit 5 for
8    identification as of this date;
9    retained by counsel.)
10       * * * * * * *
11       (At which time, Defendant's
12   Exhibit 5 was shown to the witness.)
13       * * * * * * *
14   A.    Lara SB, but this is a
15   different size.  It's a larger cup
16   size, but it's actually the same
17   style.
18   BY MS. FARRELL:
19   Q.    So Exhibit 5 is also the
20   Lara SB?
21   A.    Yes.
22       But what you see here quite
23   well is that we enlarge the widths
24   of the straps once you have bigger
25   cups because the straps have to

Page 49

1    hold more weight and we want an
2    even distribution of the weight on
3    the shoulders.  Particularly
4    important because the women, really
5    about 30 percent, develop
6    lymphedema after breast cancer.  It
7    can happen up to three years after
8    the surgery, and depending on how
9    much lymph nodes have been taken
10   out.
11       But if you only have a
12   lymphectomy and you had only taken
13   out one, you are already at stage
14   one for lymphedema and that's why
15   we take a lot of effort to keep
16   this in mind and have an even
17   distribution on the weight and
18   also, yes, especially on the
19   straps.
20   Q.    So, would it be true, as the
21   sizes -- for example, the Lara,
22   which we now have as Exhibit 4 and
23   Exhibit 5, as the sizes change,
24   there are some modifications that
25   are made to the brassiere because

Page 50

1   of the size change, is that fair?
2       A.    Yes, that's fair.
3           Because we need --
4           If you have a size that's an
5   E -- no, it's a double D in the US.
6           If you have a double D
7   breast form, that's a lot, that is
8   really heavy, and you have to -- to
9   keep it in place.
10          So you really have to have a
11  good support, a good bra which
12  covers the breast form and which
13  keeps it in place.
14          So we don't want to move it
15  around.  It shouldn't slip from
16  back to -- from right to left.
17          So that's why we also --
18          Sometimes, if it's not
19  enough support, what we sometimes
20  learn from our patients or from
21  your customers that we need
22  particular styles; for example,
23  more support of the sides than we
24  have; sometimes some re-enforcement
25  here in order to just have more

Page 51

1   (Indicating).
2       Q.    You are pointing to the wing
3   area, I think we are calling that?
4       A.    Yes.
5       Q.    And the insert for the form
6   in Exhibit 5, is it the same as the
7   one in Exhibit 4?
8       A.    Yes, it is.  Yes.  It's just
9   a different color.
10          And the pockets are made the
11  same way.  As you see, it's always
12  with this little loop in order to
13  get an enlargement of the cup which
14  is constructed.
15      Q.    Is that little loop --
16          I know you said it was so
17  the fabric can go down to the band
18  --
19      A.    Yes.
20      Q.    -- but is it also used to
21  prevent puckering of the fabric?
22      A.    No, not really.
23          If you just follow the cup
24  form here, you just can use as
25  well, you can do it as well, but

Page 52

1   then you have it up to here and
2   then you have to stop somewhere and
3   then just the breast form can't
4   really --
5       Q.    Can't reach over?
6       A.    Yes, can't reach over,
7   exactly.
8           So this is what we're
9   actually looking for, that we have
10  a little bit of space and the
11  breast form.
12          Once you have asymmetrical
13  one, it's properly fitted as well.
14  Because sometimes there is really
15  tissue missing here.
16          The women, sometimes it's
17  really horrible how they look after
18  surgery.  Then they need to fill
19  this gap and that's why they have
20  different forms, yes.
21      Q.    Understood.
22          MS. FARRELL:  If we can
23  mark this as Exhibit 6.
24      * * * * * * *
25      (Sample of an Amoena "Lara"

Page 53

1   satin bra was marked as Defendant's
2   Exhibit 6 for identification as of
3   this date; retained by counsel.)
4       * * * * * * *
5       (At which time, Defendant's
6   Exhibit 6 was shown to the witness.)
7       * * * * * * *
8   BY MS. FARRELL:
9       Q.    We're showing you,
10  Ms. Schroeter, what has been marked
11  as Defendant's Exhibit 6.
12          Do you know what type of bra
13  that one is?
14      A.    It's basically the same.
15  It's a Lara, but with another
16  fabric.  It has the satin fabric
17  here.
18          Do you see?
19          So it has padded shoulder
20  straps as well.
21      Q.    Would that fall on the same
22  page in the model sheets, just
23  different fabric?
24      A.    No.  It should be Lara satin
25  SB, I think.  Lara Satin SB.

Page 54

1    But that's black. We have a
2 beige one. That is a correct one,
3 but it's black here.
4    Q.    That's the same, just a
5 different color?
6    A.    Same, just a different
7 color, exactly.
8        So you see here it's the
9 same as the one before, just a
10 little element here, the style
11 element, the satin, a bit more
12 feminine look, but has all the
13 features.
14        Then again, as the normal
15 Lara it has the charmeuse inside in
16 order to have this un-elastic part
17 to give support and really not to
18 get the breast form from moving.
19 And then we have the special pocket
20 construction. We have the padded
21 shoulder straps. We have the frame
22 is quite high here. We have this
23 under-bust band, as I called it
24 earlier. This is a little bit
25 elastic, but it's sewn onto, so

Page 55

1 once you have stitching onto an
2 elastic material, it blocks it.
3        So, for example, when you
4 stretch a T-shirt, for example,
5 then the seam breaks at some point
6 when you over stretch it. So, yes,
7 a seam sort of, yes, blocks the
8 elastic at a certain part, and you
9 see there are slightly elastic, but
10 they have all stitching in there in
11 order to prevent --
12        They are not torn out. Is
13 that the correct word? I don't
14 know.
15        So, yes, they have some
16 blocking so they can carry the
17 weight of the breast form.
18    Q.    If it were just all elastic
19 it would stretch beyond where you
20 wanted it to stretch?
21    A.    Yes.
22        And the top stitching here
23 is non-elastic. It's a normal
24 thread. I think it's a polyamide
25 thread probably. It should be here

Page 56

1 as well, but I'm not sure if they
2 put it in. I can't read it. They
3 didn't specify the color.
4    Q.    It says "throughout"?
5    A.    Yes, polyamide I think it
6 is, yes. Maybe they don't or
7 didn't put it in because it's a
8 standard yarn.
9    Q.    It says "strap."
10    A.    For standard, like the yarn,
11 they sometimes don't put it in
12 because they know what to or they
13 specified it already, maybe in the
14 quality menu, I'm not sure.
15        Then we have the wings here
16 for testing as well, yes.
17    Q.    So, this Lara brassiere is
18 essentially the same as the others,
19 so it has some satin to make it a
20 prettier fabric?
21    A.    Yes. Accessorized piece,
22 yes.
23    Q.    So, the amenities to that
24 bra are for just looks versus
25 function?

Page 57

1    A.    Yes, Lara satin. They
2 really do look similar. I mean,
3 this is why, yes.
4    Q.    Yes, you can see the
5 difference in the satin part.
6    A.    But fit-wise they are really
7 similar.
8        MS. FARRELL: Can we have
9        this marked as Defendant's
10        Exhibit 7.
11        * * * * * * *
12    (Sample of an Amoena "Barbara"
13 bra was marked as Defendant's
14 Exhibit 7 for identification as of
15 this date; retained by counsel.)
16        * * * * * * *
17    (At which time, Defendant's
18 Exhibit 7 was shown to the witness.)
19        * * * * * * *
20 BY MS. FARRELL:
21    Q.    Ms. Schroeter we're showing
22 what has been previously marked as
23 Defendant's Exhibit 7.
24        If you could let me know
25 where in the model sheets this one

Page 58

1  falls.
2  A.    This is the Barbara.  That's
3  the one (Indicating).
4  Q.    I thought I saw Barbara's
5  name show up in the beginning of
6  the document.
7  A.    Yes.
8       So this is our shoulder
9  strap.
10      You can wear it strapless as
11  well.  It has a very special rigid
12  construction so women can wear it
13  without a strap as well, if they
14  wish.
15      So it has --
16      It's a very small size.
17  What size is it?  70.  In the US
18  it's 32C.
19      So you see the charmeuse
20  inside here as well?  So that's
21  another pocket.  So -- but it's the
22  same construction again here.
23      What we have put in here is
24  like a silicone tape so it's not
25  falling down, but it just sticks

Page 59

1  better.  But the construction
2  itself is more rigid.
3       So we have these side bones
4  in here as well in order to have a
5  better support here.  And it holds
6  really firmly the breast form.
7       Basically it has the same
8  features as the other one.  The
9  cups are molded as well.  But you
10  don't see here --
11      You only see here in the
12  inside that's the frame, what we
13  call it.  It's in here as well.
14      And this part is non-elastic
15  in the charmeuse, which is put
16  inside.  They have just put it,
17  like, without a seam on the outside
18  so you can wear it easily with a
19  T-shirt or a blouse and you can't
20  see anything underneath.
21      So the sides are quite high
22  as well, yes.
23  Q.    It seems on this Exhibit 7
24  that the strap runs inside of the
25  area where the form would go?

Page 60

1  A.    Yes.
2  Q.    Why is that?
3  A.    This is a very old style we
4  have for years already, but this is
5  -- we can --
6       I actually don't know why
7  they put it in here.  I don't know.
8  It's a very old style.
9  Q.    Do you think it's to hold
10  the form in place?
11 A.    No.  They don't --
12      I wouldn't use it to hold
13  the form in place because when you
14  put the breast form underneath,
15  see, then it's not working.
16      I think it has something to
17  do with stabilization.  You put it
18  on top of this one in here, so
19  maybe just to have more
20  stabilization in that part.  You
21  know what I mean, in the length, so
22  it's not stretching that way so
23  it's blocking anything or --
24      Yes, that's could be, but
25  I'm not quite sure because I

Page 61

1  haven't developed this style.
2       So it's a very old style for
3  us, but it's a blocking.  But the
4  breast form has to be put over in
5  here and not underneath the strap
6  (Indicating).
7  Q.    So it goes between the cup
8  and the fabric in the back?
9  A.    Yes, so it doesn't --
10      It squeezes the breast form.
11  It's a bit stretchy, but the
12  composition is probably a pocket
13  fabric, similar to the outer fabric
14  back wing has less elastin, so it's
15  different types of elasticity
16  within that product and the side
17  wing and center front and side
18  wing, they don't have any -- they
19  don't have anything in there.
20      So we always combine
21  different sort of fabrics together
22  and then sew it together so in the
23  end the whole construction and the
24  different parts of elasticity
25  combined with non-elastic parts

Page 74

1    A.    Yes.  Exactly.  That's where
2    the arm pit is, correct.  Yes, it's
3    a well known style with us and
4    since years and we don't change it.
5    We leave it as it is.
6    Q.    That style has never
7    changed, the Nancy?
8    A.    We do it in color updates,
9    but we don't change the fit of it.
10   Q.    Or the style of it other
11   than color?
12   A.    Only in color.  It's the
13   same fabric because if we use
14   another fabric then it's another
15   style for us.  Each fabric behaves
16   different and it's fitted on women,
17   so we use mastectomy patients for
18   fitting as well in all sizes so
19   they all wear their breast form and
20   then we fit the bra on the ladies
21   with the breast form.
22   Q.    When you say you are fitting
23   the bra, can you describe what that
24   means?
25   A.    So, when the first sample

Page 75

1    comes in, we call in models,
2    usually three models, two or three
3    models in different sizes and they
4    bring their own breast forms.  They
5    are usually wearing Amoena breast
6    forms, they have to because we have
7    to adapt everything towards the
8    breast form and then they try it on
9    and then the development manager,
10   yes, she is fitting the garment and
11   she looks as if are the breast
12   forms covered, does it cut in
13   anywhere, is it very comfortable
14   while wearing, is she moving, does
15   it pop out.  All these things.  So
16   that's what the fitting is.  Then
17   she measures everything, also how
18   the strap and the distance from
19   strap to strap.  So she takes all
20   the measurements on the lady and
21   then checks if the product itself
22   corresponds to the measurement
23   chart and the information which we
24   have given to the manufacturer, and
25   in the end if fits actually.  So it

Page 76

1    holds the breast form.  So we do
2    adapt the brassiere to the breast
3    form.  But if a woman goes into the
4    medical shop, she first gets a
5    brassiere and afterwards we choose
6    the correct breast form because
7    first of all the bra has to fit and
8    also to the remaining breast and
9    then you look at the posture and
10   the whole outcome of the bra and
11   then you can choose the right
12   breast form for the women.  It's a
13   unit.
14   Q.    So when a woman is buying
15   this system, this event, first the
16   chicken and the egg; first comes
17   the bra and then comes the form?
18   A.    Yes.  Exactly because it has
19   to fit to the remaining breast and
20   it has to give enough support.
21   It's a very individual procedure
22   because every woman has yes, of
23   course, a different form and a
24   different breast.  Even in the same
25   sizes they have a different form of

Page 77

1    the cup or the breast, even the
2    remaining breast and they have to
3    be really measured.  It can take up
4    to an hour to measure everything to
5    fit a correct bra.  Maybe she has
6    to wear or try on different models
7    and then we look at how the breast
8    form, yes, fits in.
9    Q.    So you are trying to match?
10   A.    You need to match both
11   sides.
12        So you have to balance also
13   from the weight perspective because
14   it has to do with your posture as
15   well and your neck and your spine,
16   because this is all connected.
17        So, in the end, the weight
18   or not having any weight is
19   connected to your muscles and
20   everything so you need to have
21   proper fitting in order to not get
22   any headaches or muscle aches or
23   walk like this (Indicating).
24        MS. FARRELL:  Let the
25   record reflect the witness